UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

LISA MCCARTY AND EDNA ROBERTS

VERSUS

SOUTHLAND BUILDERS & ASSOCIATES
INC., ET AL.

CIVIL ACTION NO. 05-0497

JUDGE S. MAURICE HICKS, JR.

MAGISTRATE JUDGE HORNSBY

MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment (Record Document 51) filed

by the defendant, Southland Builders & Associates ("Southland").  The plaintiffs, Lisa

McCarty ("McCarty") and Edna Roberts ("Roberts"), oppose the Motion for Summary

Judgment.  See Record Document 56.  For the reasons assigned herein, the Motion for

Summary Judgment is **GRANTED** and the plaintiffs' claims against Southland are

**DISMISSED**.[1]

I.      **FACTUAL AND PROCEDURAL BACKGROUND.**[2]

Southland, a corporation, is a call center whose primary business activity is to solicit

---

[1]Plaintiffs also named Lloyd Guevara (owner and general manager of Southland)
and Lee Shumway (Plaintiffs' supervisor) as defendants in this matter.  All claims against
defendant Lloyd Guevara were dismissed on October 11, 2005.  See Record Document
13; Record Document 51-2 at 2.  Certain claims against defendant Lee Shumway were
also dismissed on October 11, 2005.  See Record Document 13.  However, plaintiff Lisa
McCarty's battery claim against defendant Lee Shumway remains.  See Record Document
8, ¶¶ 4, 9.  Plaintiff Lisa McCarty alleged that Lee Shumway committed acts of battery for
which he is personally liable and the instant Memorandum Ruling has no effect on such
claim because Lee Shumway is not a party to the instant Motion for Summary Judgment.
See id., ¶ 9.

[2]Limited factual background is necessary in considering the instant Motion for
Summary Judgment, as the motion considers only the employee-numerosity requirement
for establishing federal Title VII and Louisiana Title 23 "employer" status.

individuals over the telephone to purchase home remodeling materials.  See Record Document 51, Exhibit 1 (Affidavit of Lee Shumway), ¶ 7.  Southland employs telephone marketers to make calls to potential customers.  See id.  Southland experiences frequent employee turnover and new employees are constantly being trained.  See id., ¶ 8.

McCarty began her employment with Southland on June 16, 2004 and resigned October 19, 2004, allegedly due to work related stress arising from the sexually hostile work environment caused by her supervisor, Lee Shumway ("Shumway").  See Record Document 8, ¶ 3.  Roberts had been employed by Southland intermittently since August 2000.  See id., ¶ 6.  She alleges that she was constructively discharged on or about September 29, 2004 due to the harassment by Shumway, her supervisor, and the toleration of such harassment by Southland owner, Lloyd Guevara ("Guevara").  See id., ¶¶ 6-7.

Plaintiffs filed suit in the First Judicial District Court, Caddo Parish on December 13, 2004, alleging sexual harassment under Title VII and violation of certain Louisiana anti-discrimination statutes.  See Record Document 1.  Plaintiffs filed a First Amended and Supplemental Complaint on March 18, 2005.  See Record Document 8.  The case was removed in March 2005 and is now properly before this Court.  See Record Documents 10 & 17.

On April 29, 2005, Southland and Guevara filed a Rule 12(b)(6) Motion for Partial Dismissal.  See Record Document 22.  The Court granted the Motion for Partial Dismissal as follows: (1) all claims by both plaintiffs that are based on La. R.S. 51:2256 or that otherwise attempt to assert a retaliation claim under Louisiana law are dismissed; (2) all Title VII and Title 23 claims against Guevara are dismissed; and (3) all claims against

Southland for vicarious liability arising from the alleged battery committed by Shumway on McCarty are dismissed.  See Record Document 31.  Based on this order, the remaining defendants are Southland and Shumway.  See id.

On March 14, 2005, Southland filed the instant Motion for Summary Judgment, arguing that Southland did not employ 15 or more employees for 20 or more weeks in either the current or preceding year of the alleged discrimination (2003 or 2004) as required by Title VII.  See Record Document 51.  Likewise, Southland argued that it did not employ 20 or more employees for each working day for 20 or more calendar weeks as required by Louisiana Title 23.  See id.  The plaintiffs oppose the Motion for Summary Judgment and maintain that there is a genuine issue of material fact as to the number of employees; that Guevara was an employee as well as being the owner; and that three Southland salesmen were employees and not independent contractors.  See Record Document 56.

## II.    LAW AND ANALYSIS.

### A.    Summary Judgment Standard.

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c);  New York Life Ins. Co. v. Travelers Ins. Co., 92 F.3d 336, 338 (5th Cir. 1996).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); see also Gunaca v. Texas, 65 F.3d 467, 469 (5th Cir. 1995).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 477 U.S. at 323-25, 106 S. Ct. at 2552).  If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." Little, 37 F.3d at 1075.

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Wallace v. Texas Tech Univ., 80 F.3d 1042, 1046-47 (5th Cir. 1996).  The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. Little, 37 F.3d at 1075; Wallace, 80 F.3d at 1047.  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Wallace, 80 F.3d at 1048 (quoting Little, 37 F.3d at 1075); see also S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." McCallum Highlands v. Washington Capital Dus, Inc., 66 F.3d 89, 92 (5th Cir. 1995), as revised on denial of rehearing, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 249-51, 106 S. Ct. 2505, 2511 (1986).

In order to determine whether or not summary judgment should be granted, an examination of the substantive law is essential.  Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.

With these principles in mind, the Court now turns to a review of the claims at issue.

**B.     Title VII Claims - Requisite Number of Employees.**

The key issue to resolve in the instant litigation is whether Southland was an employer under Title VII.  Southland contends that it did not employ "fifteen or more employees for each working day in each of twenty or more calendar weeks in" 2003 or 2004, as required by Title 42, United States Code, Section 2000e(b).[3]  Conversely, the plaintiffs maintain that Southland employed the requisite number of employees if certain salesmen, Southland's owner and general manager, and "mid-week" employees are included in the number count. The Court will examine each contention separately.

**1.     Salesmen.**

The plaintiffs argue that salesmen George Lindell ("Lindell") and Danny Powell ("Powell") are employees.  Conversely, Southland maintains that the salesmen were not employees for Title VII purposes, but rather independent contractors.

The Fifth Circuit applies the hybrid economic realities/common law control test to determine who is an employee for Title VII purposes.  See Mares v. Marsh, 777 F.2d 1066,

_____

[3]Title 42, United States Code, Section 2000e(b) defines the term "employer" as "a person engaged in an industry affecting commerce who has **_fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year_**."  42 U.S.C.A. § 2000e(b) (emphasis added).

1067 (5th Cir. 1985); see also Arbaugh v. Y&H Corp., 380 F.3d 219, 226 (5th Cir. 2004),

rev'd on other grounds, 546 U.S. 500, 126 S.Ct. 1235 (2006).  Such test considers the

"'economic realities' of the work relationship as an important factor in the calculus, but . .

. focuses more on 'the extent of the employer's right to control the means and manner of

the worker's performance.'"  Mares, 777 F.2d at 1067.  The factors pertinent to the control

inquiry are: "(1) ownership of the equipment necessary to perform the job; (2) responsibility

for costs associated with operating that equipment and for license fees and taxes; (3)

responsibility for obtaining insurance; (4) responsibility for maintenance and operating

supplies; (5) ability to influence profits; (6) length of the job commitment; (7) form of

payment; and (8) directions on schedules and on performing work."  Arbaugh, 380 F.3d at

226, citing Broussard v. L.H. Bossier, Inc., 789 F.2d 1158, 1160 (5th Cir. 1986).

　　　　The plaintiffs point to the above-referenced factors and argue that Southland

controlled the means and manner of the salesmen's work by making the time and date of

their appointments.  See Record Document 56-1 at 29.  The plaintiffs also note that

Southland provided tools, such as forms, financing, leads, and product samples, to the

salesmen.  See id.  On the issue of control, the plaintiffs maintain that Guevara could hire

and fire a salesman; that Guevara supervised the salesmen, especially Lindell; and that

"flexible hours alone do not alone make a Title VII claimant an independent contractor."

Id. at 29-31.  Further, the plaintiffs contend that the salesmen were economically

dependent upon Southland for their income.  See id. at 31.  The plaintiffs also rely on the

following facts to support their contention that Southland controlled the means and manner

of employment of the salesmen and that the relationship was more akin to an employee

than an independent contractor: (1) the duration of the relationship (10-15 years); (2) the

salesmen did not sell competitor's products; (3) the manner of assigning leads; (4) scheduling appointments; (5) the control the company had over financing the work; (6) the supervision by Guevara over the salesmen; and (7) the provision of directions to homes. See id. at 32.

Notwithstanding the plaintiffs' position that the factors applied under the hybrid economic realities/common law control test indicate a relationship more akin to an employee than an independent contractor, the Court has reviewed and applied the same factors and concludes, based on record evidence, that the salesmen at issue in this case were independent contractors, not employees. The first factor considered in the control inquiry is the ownership of the equipment necessary to perform the job. Here, Southland does not provide the salesmen with tools or materials such as business cards, uniforms, cars, or cell phones. See Record Document 56, Exhibits B (Guevara deposition), D (Lindell deposition), & E (Powell deposition). Further, the salesmen are not reimbursed for their expenses, such as mileage, gas, vehicle repairs, cell phones, auto insurance, and lodging. See id. Such facts also indicate that the responsibility for maintenance and operating supplies falls with the salesmen, not Southland. The salesmen are also responsible for their own health insurance and retirement. See id., Exhibit B. Worker's compensation premiums are taken and deducted form the salesmen's draws. See id., Exhibits D & E. Thus, the responsibility for costs associated with their jobs and for obtaining insurance falls with the salesmen. The salesmen are paid on a commission, hence they directly influence their own profits based upon how well they perform their jobs and the number of appointments they fill. See id., Exhibits B, D, & E. Specifically, when asked in his deposition how profit is determined, Powell stated that "it's what you put into

the job itself." Id., Exhibit E at 10.  Another factor to consider is the length of the job commitment and, while Powell and Lindell have contracted with Southland for some time, both stated that they have the right to work elsewhere if they so choose.  See id., Exhibit E at 62 & Exhibit D at 17.  Powell testified that he has worked in the field of real estate, has sold cars, and sold insurance, all while working with Southland.  See id., Exhibit E at 8 & 61.  Finally, as to directions on schedules and on performing work, both Powell and Lindell have stated that they have no set hours.  See id., Exhibit E at 63 & Exhibit D at 10, 20. The record evidence indicates that Southland treats the salesmen as contractors, only requesting them to work when there is work available for them.  See id., Exhibit E at 18 & Exhibit D at 48.  Further, while the salesmen admit that they coordinate their work scheduled with Southland, both stated that their appointments are not unilaterally directed by Southland.  See id., Exhibit E at 30, 32 & Exhibit D at 10, 20.  Guevara also testified that Southland does not control or direct how the salesmen perform their work, in that he does not control how the salesmen deliver their sales pitches or seal the deal.  See id., Exhibit B at 18.  Likewise, Southland does not provide training to the salesmen and the salesmen are not given performance evaluations.  See id., Exhibit B at 47, Exhibit D at 18-19, & Exhibit E at 27-28.

Simply put, the Court finds that the control factors indicate that the salesmen were independent contractors, not employees of Southland.  Other than forms and product samples, Southland did not provide materials to the salesmen; the salesmen were not supervised/controlled by Guevara; they provided their own vehicles and phones; they were paid commission; they had no annual or sick leave; they had no retirement benefits; and they did not pay social security taxes, did not have taxes withheld from their commissions,

and did not receive W-2s from Southland.  While the salesmen are at the Southland office a few times a week, they do not have an office or a desk there.  See id., Exhibit B at 14, 63, Exhibit D at 45-46, & Exhibit E at 35.  Rather, the salesmen work out of their cars and their office is essentially the potential customer's home.  See id., Exhibit D at 46 & Exhibit E at 35.  The record evidence overwhelmingly indicates that the salesmen are independent contracts and not employees under the meaning of Title VII.

### 2.    Owner and General Manager.

The plaintiffs allege that Guevara was an employee as well as being the owner of Southland and allege that "counting Guevara alone would establish the requisite number of weeks and employees" under Title VII.  Record Document 56-1 at 6.  The plaintiffs maintain that Guevara is an employee due to "legal positions taken by [Southland]"[4] and "[Southland's] treatment of [him.]"  Id. at 32.

There is no dispute that Guevara is the sole owner and sole shareholder of Southland.  See Record Document 56, Exhibit B at 5-6.  In Clackamas Gastroenterology Associates, P. C. v. Wells, 538 U.S. 440, 123 S.Ct. 1673 (U.S. 2003),[5] the Supreme Court

---

[4]The plaintiffs argue that because this Court previously ruled that Guevara, owner and general manager of Southland, was not subject to liability under Title VII or Louisiana's Title 23, it necessarily follows that Guevara must then be an employee.  Such reasoning is flawed.

   The Court simply ruled that Guevara was not subject to individual liability under Title VII because he was not an "employer" as defined by Title VII or Louisiana's Title 23.  This ruling is not legally inconsistent with a finding that Guevara is not an employee as defined by Title VII or Louisiana's Title 23.

[5]The plaintiffs argue that the Clackamas case is inapplicable to the instant matter "because it involved a professional corporation and not the standard business corporation which is at issue here."  Record Document 56-1 at 34.  The Court disagrees and will follow Supreme Court precedent in this case.

set forth six factors relevant to determining whether a shareholder-director is an employee under Title VII: (1) "whether the organization can hire or fire the individual or set the rules and regulations of the individual's work; (2) whether and, if so, to what extent the organization supervises the individual's work; (3) whether the individual reports to someone higher in the organization; (4) whether and, if so, to what extent the individual is able to influence the organization; (5) whether the parties intended that the individual be an employee, as expressed in written agreements or contracts; and (6) whether the individual shares in the profits, losses, and liabilities of the organization." Id. at 449-450, 123 S.Ct. at 1680.  The Court on to reason that "the answer to whether a shareholder-director is an employee depends on 'all of the incidents of the relationship . . . with no one factor being decisive.'" Id. at 451, 123 S.Ct. at 1681.

In Arbaugh v. Y&H Corp., 380 F.3d 219 (5th Cir. 2004), rev'd on other grounds, 546 U.S. 500, 126 S.Ct. 1235 (2006), the Fifth Circuit reasoned that owners and their wives were not employees for purposes of determining Title VII liability.  The Court noted certain record evidence, namely that "it [was] unlikely that Y&H [Corp.] could hire or fire" any of the wives; the owners and their respective wives "[were] partners who, if it was decided that the working relationship was unpalatable, would have to engage in a dissolution process in accordance with the corporate structure under which they were originally organized"; and "there [was] no evidence demonstrating that the wives were supervised in their advertising and promotional work, nor is there any indication that they reported to anyone higher in the organization." Id. at 230.  Further, "the wives were not designated as employees either in written agreements or contracts" and "the record clearly establishe[d] that the wives, along with their husbands, shared alike in Y&H [Corp.'s] profits, losses, and liabilities." Id. Based

on this record evidence, the Fifth Circuit "determined that [the owners] and their respective wives should not be counted as employees for purposes of determining Title VII liability." Id.

Under the reasoning set forth in Clackamas and Arbaugh, the record evidence in this case weighs in favor of a conclusion that Guevara is not an employee of Southland. For example, Southland can not hire or fire Guevara or set the rules and regulations of his work, as he is the sole owner; no one at Southland supervises Guevara and he does not report to another individual employed by Southland; Guevara controls Southland and directs its operations; there is no indication of a written or oral agreement designating Guevara as an employee; and Guevara shares in the profits and losses of Southland. The plaintiffs' attempt to overcome such evidence by pointing to the fact that Guevara was a "hands on" work; that Guevara received a regular paycheck from which taxes were deducted; and that Louisiana Department of Labor, Internal Revenue Service, and other tax documents reflect that Guevara was an employee. See Record Document 56-1 at 33. Yet, these mere facts do not outweigh the record evidence as a whole. The evidence referenced above, namely taken from the depositions of both Guevara and Shumway, clearly show that Guevara owned and managed the enterprise of Southland; he hired and fired; and he assigned tasks and supervised the performance of such tasks. The "incidents of the relationship" between Guevara and Southland evince that he was not an employee under the meaning of Title VII. See Clackamas, 538 U.S. at 451, 123 S.Ct. at 1681.

### 3.    Number of Employees.

Because this Court has ruled that neither Guevara nor the salesmen were

employees under Title VII, this case turns on whether certain "midweek" employees[6] should be counted in determining whether Southland meets the employee numerosity requirement of Title VII.  Southland is subject to Title VII only if at the time of the alleged discrimination it met the statutory definition of employer:  "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  42 U.S.C. § 2000e(b).

Southland argues that it did not employ 15 or more employees for 20 or more weeks in either 2003 or 2004 because "if an employee either starts midweek or leaves employment midweek, that employee is not counted for that week, even if one employee immediately replaces another employee on the same day or the day after the leaving employee departs."  Record Document 51-1, ¶ 4.  Southland relies on the "payroll method," as set forth in Walters v. Metropolitan Educational Enterprises, Inc., 519 U.S. 202, 117 S.Ct. 660 (U.S. 1997), to support its contention.  Conversely, the plaintiffs contend that midweek employees should be counted and that Southland's position that an employee who does not work a full six day week should not be counted is in direct conflict with the reasoning of Walters.  See Record Document 56-1 at 5.

In Walters, the Supreme Court reasoned that the payroll method represented the fair reading of Section 2000e(b), which sets as the criterion the number of employees that the employer "has" for each working day.  Walters, 519 U.S. at 207, 117 S.Ct at 664.  The payroll method considers "whether the employer has an employment relationship with the

---

[6]Midweek employees refers to an employee who either starts or ends their employment midweek.  See Record Document 51-2 at 4.

individual on the day in question" and is referred to as the "payroll method since the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll." Id. at 206, 117 S.Ct. at 663.  The Walters Court also stated that the "words in a statute are assumed to bear their ordinary, contemporary, common meaning" and that "in common parlance, an employer 'has' an employee if he maintains an employment relationship with that individual." Id. at 207, 117 S.Ct. at 664 (internal quotation and citation omitted).  In conclusion, the Court held:

> Under the interpretation we adopt, by contrast, all one needs to know about a given employee for a given year is whether the employee started or ended employment during that year and, if so, when.  He is counted as an employee for each working day after arrival and before departure.
>
> As we have described, in determining the existence of an employment relationship, petitioners look first and primarily to whether the individual in question appears on the employer's payroll. . . . . [W]hat is ultimately critical under [the] method is the existence of an employment relationship, not appearance on the payroll; an individual who appears on the payroll but is not an "employee" under traditional principles of agency law . . . would not count toward the 15-employee minimum. . . . [T]he ultimate touchstone under § 2000e(b) is whether an employer has employment relationships with 15 or more individuals for each working day in 20 or more weeks during the year in question.

Id. at 211-212, 117 S.Ct. at 665-666 (internal citation omitted); see also Guillory v. Rainbow Chrysler Doge Jeep, L.L.C., 158 Fed.Appx. 536 (5th Cir. 2005).

Walters has been widely employed by federal district courts both in and outside of the Fifth Circuit.  See Alwine v. Buzas, No. 2:00 CV 0245C, 2002 WL 425833 (D.Utah March 19, 2002); Taylor v. Eastside Auto, Truck and Tire Repair, No. CIV.A. 99-3613, 2001 WL 214032 (E.D.La. March 5, 2001); Latimer v. Wise, 193 F.Supp.2d 899 (E.D. Tex. 2001); Tyler v. Int'l Brotherhood of Electrical Workers, Local Union 130, No. CIV.A 98-3522, 2000 WL 17839 (E.D.La. Jan. 11, 2000); and Sharp v. Earth Science Laboratories,

No. Civ.A. 98-2573, 1999 WL 493274 *1 (E.D. La. July 9, 1999).  In Sharp, the district court

cited Walters, observing that "an employee who works irregular hours, perhaps only a few

days a month, will be counted" under the payroll method; thus, "some part-time workers

may be counted as employees."  Sharp, 1999 WL 493274, *2; see also Taylor, 2001 WL

214032, *2.  Yet, further relying on Walters, the Sharp court also noted that "an individual

who appears on the payroll but is not an employee under traditional principles of agency

law would not count."  Id. (internal quotations and citations omitted).  In Alwine, a Utah

district court closely examined and applied Walters, stating:

> In order to be counted as one of fifteen (15) employees in any calendar week
> for the purpose of meeting . . . the . . . minimum of Title VII, an employee
> must be employed "every working day" of the week.  This does not mean that
> the employee must be present at work and receiving monetary compensation
> for each day.  *It does mean, however, that "the employer must have an
> employment relationship with the individual on the day in question."*
>
> . . .
>
> *[W]hether a person is an employee for Title VII purposes is determined
> by the existence of an employment relationship between the employer
> and employee on the day in question.*

Alwine, 2002 WL 425833, *3-4 (emphasis added).

Southland's "working days" are Monday to Saturday and the "current" and

"preceding" calendar years for purposes of the plaintiffs' discrimination claims are 2003

and 2004.  For 2003, the summary judgment evidence indicates 6 weeks where Southland

undisputably employed less than 15 employees; 15 weeks where Southland undisputably

employed more than 15 employees; and *32 weeks where "midweek employees" are an

issue*.  For 2004, the summary judgment evidence indicates 22 weeks where Southland

undisputably employed less than 15 employees; 10 weeks where Southland undisputably

employed more than 15 employees; and ***20 weeks where "midweek employees" are an***

***issue***.  Again, such midweek employees are individuals who either started or ended their

employment midweek and the critical issue is whether such individuals are to be counted

as employees under the <u>Walters</u> payroll method.  For example, the payroll transaction

reports and the time cards submitted by Southland evidence individuals who worked only

one day for several hours; others were hired midweek; others stopped working and

terminated their employment midweek; and still others who worked for a few days and then

quit working within the week.  <u>See</u> Record Document 51, Exhibits 4-61, 64-199.  Another

example of midweek employees are those who worked two or three working days of one

calendar week, worked two or three working days in the next calendar week, and then quit

working before ever working each working day in either calendar week.  <u>See id.</u>, Exhibits

74-75 (Lemoine), 77-78 (Lemoine), 80-81 (Tracy), & 84-85 (Tracy).

Southland has presented the affidavit of Shumway, who performs and runs the

weekly payroll of Southland, including generating time cards, time records, and weekly

payroll transaction reports.  <u>See</u> Record Document 51, Exhibit 1 at ¶¶ 4-5.  Shumway

described the frequent employee turnover at Southland and stated that "the majority of

employees of the call center quit; they either tell Southland . . . they are quitting or they do

not show back up for work."  Specifically, he attested:

> When an employee quits, whether or not he/she tells Southland . . . that they
> are quitting, or fails to show back up for work, their employment with
> Southland . . . ends.  The last day of employment is the last day shown on
> their time card.
>
> . . .
>
> ***It is Southland['s] . . . common and ordinary practice to consider an***

***employee's employment to have ended when they failed to show back up for work.***

Id., Exhibit 1 at ¶¶ 9, 11 (emphasis added).  According to Shumway, Southland normally employed 14 employees, when fully staffed, in 2003 and 2004.  See id., Exhibit 1 at ¶ 10.  Shumway also specifically described the time cards, which Southland has submitted as summary judgment evidence:

> The time cards [in the record] . . . show either the employee's first or last week of employment.  For time cards for the employee's hiring week, the first date listed on that timecard is the employee's first date of employment.  For time cards for the employee's last week of employment, the last date listed on that timecard is the date upon which the employee's employment ended.
>
> Those employees whose last week of employment is shown by the time cards were not employed by Southland . . . the next week, as shown by the absence of that person's name on the next week's payroll transaction report.
>
> Those employees whose first week of employment is shown by the time cards were not employed by Southland . . . the week prior to that week, as shown by the prior week's payroll transaction reports.

Id., Exhibit 1 at ¶¶ 12-14.

The Court finds that the instant matter presented a close call as to the application of the Walters payroll method to the underlying facts of this case, but concludes that Southland has come forward with competent summary judgment evidence demonstrating that the plaintiffs could not, at trial, establish that Southland employed 15 or more employees for each working day in each of twenty or more calendar weeks in 2003 or 2004.  See 42 U.S.C. § 2000e(b).[7]  The plaintiffs argued that the midweek employees at issue in this case are akin to part-time employees who work each day but less than a full

_____

[7]The employee-numerosity requirement of Title VII relates to the substantive adequacy of a Title VII claim.  See Arbaugh, 546 U.S. 500, 126 S.Ct. 1235.

day.  See Record Document 56-1 at 3.  The plaintiffs also maintained that if there was a seamless relationship between two employees for the week, i.e., employee A quit on Monday at the end of the working day, but employee B was hired on Tuesday at the beginning of the working day to fill the position, then the week is counted.  See id.  The Court disagrees with both contentions.  First, this case is distinguishable from a case relating to part-time employees such as those referenced in Sharp.  While it is clear that the intent of Section 2000e(b) was not to require that employees report to work on each day that they are to be  included in the count, the telephone marketing employees at issue in this case were not the type of part-time employees who worked "irregular hours, perhaps only a few days a month."  Sharp, 1999 WL 493274, *2.  Rather, the Southland telemarketers were scheduled to work six days each calendar week.  Further, regarding the combined continuous employment argument, the Title VII case law highlighted in the instant Memorandum Ruling clearly focuses on the employment relationship with the individual employee, not the job position.  In Alwine, the court succinctly stated that "the employer must have an employment relationship with the ***individual on the day in question*** . . . [and] whether a person is an employee for Title VII purposes is determined by the ***existence of an employment relationship between the employer and employee on the day in question***."  Alwine, 2002 WL 425833, *3-4 (emphasis added).

The plaintiffs further argue that when an employee actually works his or her last minute, the employment relationship does not effectively end for all purposes and that the employment relationship is not terminated until a replacement is hired.  See Record Document 56-1 at 12-13.  Such an approach is nonsensical to the Court.  Simply put, while

the Court found matching time sheets and payroll transaction reports to be a timely and burdensome task, and truly one that <u>Walters</u> hoped to avoid, there is nothing in the record to rebut such summary judgment evidence.  Southland has come forward with its payroll records and has demonstrated how and why certain midweek employees who appear on payroll transaction reports should not be included in the Title VII employee count.  The Court finds that the record evidence, namely Shumway's affidavit, indicates that Southland experienced frequent and high employee turnover and its intention, common and ordinary practice of considering an employee's employment to have ended when they failed to show back up for work.  <u>See</u> Record Document, Exhibit 1 at ¶¶ 9, 11.  Such evidence goes directly to the determination of the existence of an employment relationship, which the <u>Walters</u> Court stated was "ultimately critical."  <u>Walters</u>, 519 U.S. at 211, 117 S.Ct. at 666. And while the plaintiffs' have submitted affidavits stating that there were 15 or more employees during "x" amount of weeks, such affidavits are based on opinion and unsubstantiated recollections, not payroll records.  In light of the summary judgment standard, such evidence is simply not enough to lead this Court to conclude that an employment relationship existed between the midweek employees and Southland sufficient to trigger Title VII.  <u>See Little</u>, 37 F.3d at 1075; <u>Wallace</u>, 80 F.3d at 1047-1048 (stating that the nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence and that factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.").  Southland has succeeded in demonstrating that the plaintiffs' would not be able to meet their burden of proving at trial that Southland employed 15 or more individuals for

each working day in 20 or more weeks during 2003 or 2004.  The law applicable to this case is clear, an employee is counted "for each working day after arrival and before departure."  <u>Walters</u>, 519 U.S. at 211, 117 S.Ct. at 665-66.  Based on the payroll transaction reports, time sheets, and Shumway's explanation of such documents, the midweek employees at issue in this case are not akin to part-time employees and  are only counted for the calendar weeks in which they worked each working day.  Accordingly, summary judgment is granted and the plaintiffs' Title VII claims against Southland are dismissed.

### C.    Louisiana Title 23 Claims.

The plaintiffs also brought a state cause of action for the same alleged discriminatory acts pursuant to Louisiana Title 23.  The provisions of Title 23 "apply only to an employer who employs twenty or more employees within this state for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." La.R.S. 23:302(2).  Given that this Court ruled in Section II(B)(3) of the instant Memorandum Ruling that the plaintiffs do not meet the lower 15 employee standard under Title VII, the plaintiffs' state law claims under Title 23 likewise fail and summary judgment is granted.

### III.    CONCLUSION.

For the reasons stated above, the Motion for Summary Judgment (Record Document 51) filed by Southland is **GRANTED** and the plaintiffs' claims against Southland

are **DISMISSED**.  An order consistent with the terms of the instant Memorandum Ruling

will issue herewith.

      **THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 28th day of March, 2007.

                                   _____

                                      S. MAURICE HICKS, JR.

                                  UNITED STATES DISTRICT JUDGE